# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued October 8, 2021          Decided October 29, 2024

No. 20-5221

JASON B. LEE,
APPELLANT

v.

MERRICK B. GARLAND, ATTORNEY GENERAL OF THE UNITED
STATES,
APPELLEE

————

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cv-02284)

————

*Morris E. Fischer* argued the cause and filed the briefs for
appellant.

*Joshua M. Koppel*, Attorney, U.S. Department of Justice,
argued the cause for appellee. With him on the brief were
*Brian M. Boynton*, Acting Assistant Attorney General, and
*Charles W. Scarborough*, Attorney.

*Bruce D. Brown* and *Katie Townsend* were on the brief for
*amicus curiae* Reporters Committee for Freedom of the Press
in support of neither party.

2

Before: HENDERSON and KATSAS, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* KATSAS.

KATSAS, *Circuit Judge*:     The Federal Bureau of Investigation revoked Jason Lee's security clearance after he failed three polygraph examinations.  It then fired Lee because his job required a clearance.  Lee contends that the revocation was based on race, national origin, and protected speech.  He brings various claims under the First Amendment, the Fifth Amendment, and Title VII.  We hold that *Department of Navy v. Egan*, 484 U.S. 518 (1988), bars judicial review of these statutory and constitutional claims.

I

A

This case arises from presidential orders restricting access to information that, if publicly disclosed, would threaten the national security of the United States.

Executive Order No. 13,526 sets forth a "uniform system for classifying, safeguarding, and declassifying national security information."  75 Fed. Reg. 707, 707 (Dec. 29, 2009). It explains: "[T]hroughout our history, the national defense has required that certain information be maintained in confidence in order to protect our citizens, our democratic institutions, our homeland security, and our interactions with foreign nations." *Id.*     The order requires designated officials to classify information under their control, *id.* at 708, if "unauthorized disclosure could reasonably be expected to cause identifiable or describable damage to the national security," *id.* at 709. Information may be classified at one of three levels—Top Secret, Secret, or Confidential—depending on its sensitivity.

3

*See id.* at 707–08. For example, a classification of "Top Secret" indicates that unauthorized disclosure "reasonably could be expected to cause exceptionally grave damage to the national security." *Id.* at 707.

To prevent unauthorized disclosure of classified information, the President restricts access to it. Executive Order 12,968 prohibits any federal employee from accessing classified information unless he has been "determined to be eligible" for access, has signed an approved nondisclosure agreement, and has "demonstrated" a "need-to-know" the information at issue. 60 Fed. Reg. 40245, 40246 (Aug. 2, 1995). Eligibility is determined through the adjudication of a security clearance. The order delegates to agency heads responsibility for clearance decisions, *see id.*, but it instructs that, in general, clearances may be granted only to:

> United States citizens for whom an appropriate investigation has been completed and whose personal and professional history affirmatively indicates loyalty to the United States, strength of character, trustworthiness, honesty, reliability, discretion, and sound judgment, as well as freedom from conflicting allegiances and potential for coercion, and willingness and ability to abide by regulations governing the use, handling, and protection of classified information.

*Id.* at 40250. The order requires that "any doubt" on these matters "shall be resolved in favor of the national security." *Id.*

This scheme has a long pedigree. Presidential orders requiring a security clearance for access to classified information have been in place since at least the early 1950s.[1]

---

[1] *See*, *e.g.*, Exec. Order No. 12,958, 60 Fed. Reg. 19825 (April 17, 1995); Exec. Order No. 12,356, 47 Fed. Reg. 14874 (April 8,

4

More generally, "the Executive Branch has engaged in efforts to protect national security information by means of a classification system graded according to sensitivity" since at least World War I. *Egan*, 484 U.S. at 527. And presidents since George Washington have kept secret information if they thought its disclosure might harm the Nation's defense or foreign-policy interests. *See* S. Exec. Journal, 1st Cong., 2d Sess. 55 (Aug. 4. 1790) (secret treaty provision).

B

This case comes to us on a motion to dismiss, so we take the following factual allegations as true. *Barker v. Conroy*, 921 F.3d 1118, 1121 (D.C. Cir. 2019).

In 2003, the FBI hired Jason Lee, an American citizen of Chinese ancestry, and granted him a Top Secret security clearance. To ensure that cleared individuals remain trustworthy, the FBI periodically subjects them to polygraph examinations. Lee failed his 2013 exam. The examiner noted problems with Lee's answers to questions about terrorism, unauthorized release of information, and failure to disclose security violations. Lee then failed a follow-up exam in 2014. This time, the examiner noted that Lee's breathing patterns indicated deception. The FBI revoked Lee's clearance.

Lee appealed the revocation to the Access Review Committee (ARC) of the Department of Justice, which reviews clearance revocations by DOJ component agencies. *See* 28 C.F.R. § 17.15(a). In 2018, the ARC ordered Lee to sit for a third polygraph exam, which was administered by FBI Agent Stacy Smiedala. Before that exam, Lee admitted to serving as

---

1982); Exec. Order No. 12,065, 43 Fed. Reg. 28949 (June 28, 1978); Exec. Order No. 11,652, 37 Fed. Reg. 5209 (March 8, 1972); Exec. Order No. 10,501, 18 Fed. Reg. 7049 (Nov. 5, 1953).

5

a source for media articles exposing what he regarded as inappropriate FBI polygraph testing practices. The exam ended when Lee refused to answer further questions about what information he had divulged to the media.

The ARC affirmed the revocation of Lee's clearance in a memorandum signed by its chairperson, Marie Barr Santangelo. Among other considerations, she cited Lee's deception in the 2018 exam; his possible deception or use of countermeasures in earlier exams; his refusal to answer questions about the articles; and the FBI's obligation under Executive Order No. 12,968 to resolve all doubts in its clearance adjudications in favor of national security. After the ARC's decision, the FBI fired Lee because his job as an intelligence officer required a clearance.

After unsuccessfully pursuing administrative remedies under Title VII, Lee filed this lawsuit. His original complaint raised Title VII claims alleging discrimination in the 2013 and 2014 polygraph examinations. The government moved to dismiss the case. Before the district court could rule, Lee moved for leave to file an amended complaint raising Title VII claims alleging discrimination and retaliation in the 2018 examination. Lee also sought to raise various First and Fifth Amendment claims.

All of Lee's claims stem from the revocation decision. His Title VII claims allege that DOJ revoked his security clearance based on polygraph exams tainted by unlawful discrimination and retaliation. Lee also argues that the revocation decision violated the Fifth Amendment because it rested on a pretextual justification and harmed his reputation and employment prospects. He contends that Smiedala violated the First and Fifth Amendments by discriminating and retaliating against him during the 2018 polygraph examination, which caused the

6

revocation of his clearance. And he claims that Santangelo violated the Fifth Amendment by failing to investigate the cause of his failed polygraph exams, which also caused the revocation. Lee sought reinstatement, backpay, and damages from DOJ, as well as damages from Smiedala and Santangelo individually.

The district court granted the motion to dismiss and denied the motion for leave to amend. It held that Lee's Title VII claims were not timely exhausted, that Title VII preempted his Fifth Amendment claims against DOJ, and that Lee lacked a cause of action to press constitutional claims for damages against the individual DOJ officials. *See Lee v. Barr*, No. 19-cv-2284, 2020 WL 3429465 (D.D.C. June 23, 2020). Our review is *de novo*. *See Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 685 (D.C. Cir. 2023) (dismissal); *Osborn v. Visa Inc.*, 797 F.3d 1057, 1062 (D.C. Cir. 2015) (motion for leave to amend denied as futile).

II

Lee contends that DOJ violated Title VII, the First Amendment, and the Fifth Amendment in revoking his security clearance. Before addressing the merits of these claims, we must consider whether they are justiciable—in other words, whether they are within "the courts' competence" to answer. *Rucho v. Common Cause*, 588 U.S. 684, 696 (2019). Two key precedents, involving challenges to adverse security clearance decisions, frame the analysis of that question.

The first is *Egan*. Like this case, it involved an individual terminated from federal employment after the government denied him a security clearance that was necessary for the job in question. *See* 484 U.S. at 522. The Civil Service Reform Act (CSRA) authorized the Merit Systems Protection Board (MSPB) to review the termination decision. *See id.* & n.3. The

7

question presented was whether this allowed the MSPB "to review the substance of an underlying decision to deny or revoke a security clearance." *Id.* at 520. The Supreme Court held that it did not.

The Court rested its decision on Article II of the Constitution. It explained that Article II, in making the President the head of the Executive Branch and the Commander in Chief, vests him with broad power over military and foreign affairs. 484 U.S. at 527. And that power includes "authority to classify and control access to information bearing on national security and to determine whether an individual is sufficiently trustworthy to occupy a position in the Executive Branch that will give that person access to such information." *Id.* The Court explained that since World War I, the Executive Branch has sought "to protect national security information by means of a classification system graded according to sensitivity." *Id.* The Court held it was "not reasonably possible for an outside nonexpert body to review" the difficult predictive judgments underlying a decision to afford access to classified information, which "must be made by those with the necessary expertise." *Id.* at 529. The Court invoked a long line of cases establishing that "courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." *Id.* at 530. And it stressed that the presumption of reviewability "runs aground when it encounters concerns of national security." *Id.* at 527. For all these reasons, the Court concluded that the decision whether to grant an employee a security clearance, "a sensitive and inherently discretionary judgment call, is committed by law to the appropriate agency of the Executive Branch." *Id.*

The second key precedent is *Ryan v. Reno*, 168 F.3d 520 (D.C. Cir. 1999), which involved Title VII challenges to employment actions resting on adverse clearance decisions.

8

This Court held that *Egan* precludes "a 'nonexpert body'—whether administrative or judicial—from resolving a discrimination claim based on an adverse employment action resulting from an agency security clearance decision." *Id.* at 523 (quoting *Egan*, 484 U.S. at 529). We explained that adjudicating such a claim would involve "reviewing the merits" of the agency's "decision not to grant a clearance," which would run "smack up against *Egan*." *Id.* at 524.

III

*Egan* plainly forecloses review of the Title VII claims here, which challenge the substantive basis for DOJ's revocation of Lee's security clearance. In his original complaint, Lee alleged that the revocation was caused by discrimination based on race and national origin in the administration of the 2013 and 2014 polygraphs. J.A. 11–13. In his amended complaint, Lee sought further to allege that the revocation was also caused by the same kind of discrimination, and by retaliation for past complaints of discrimination, in the administration of the 2018 polygraph. *Id.* at 55–58. Because all of these claims challenge the basis for DOJ's decision to revoke Lee's security clearance, *Egan* bars them all. *See Ryan*, 168 F.3d at 524.

Lee attempts to circumvent *Egan* by framing his Title VII claims as challenging only the polygraph examinations, not the revocation decision itself. Reply Br. 2. But it is unclear whether a failing grade on any of these exams, disconnected from any change in the terms and conditions of Lee's federal employment, would constitute an adverse "personnel action" covered by Title VII. *See* 42 U.S.C. § 2000e-16(a). Moreover, as the district court explained, Lee cannot raise freestanding challenges to any of the polygraph exams because he failed to contact an EEO counselor within 45 days of the relevant exam,

9

as required to exhaust administrative remedies for federal-sector Title VII claims. 29 C.F.R. § 1614.105(a)(1); *see Lee*, 2020 WL 3429465, at *3–4. To avoid that otherwise fatal problem, Lee affirmatively argues that the ARC decision was the only adverse action he could have challenged. Appellant Br. 9 ("Lee could not have prevailed on a Title VII claim based solely on the conduct of the examiners because, without the final decision from the Access Review Committee, there was no adverse employment action."). So by his own admission, Lee must be challenging the revocation decision itself, as allegedly tainted by the past polygraph exams. And *Egan* bars such Title VII challenges. *See Ryan*, 168 F.3d at 524.

## IV

Lee's constitutional claims present different justiciability questions. The district court reasoned that these claims were barred by *Brown v. GSA*, 425 U.S. 820 (1976), which held that Title VII "provides the exclusive judicial remedy for claims of discrimination in federal employment," *id.* at 835, and *Kizas v. Webster*, 707 F.2d 524 (D.C. Cir. 1983), which held that *Brown* requires even constitutional claims of federal employment discrimination to be raised under Title VII, *id.* at 541–43. *Lee*, 2020 WL 3429465, at *5. With *Brown* and *Kizas* channeling constitutional claims of employment discrimination through Title VII, and with *Egan* barring Title VII claims challenging the denial or revocation of security clearances, the upshot is that federal courts may not consider constitutional claims challenging such denials or revocations. We think the conclusion is correct, but that it follows more from *Egan* itself than from the preclusive effect of Title VII.

On several occasions, this Court has reserved the question whether *Egan* bars courts from considering constitutional challenges to adverse clearance decisions. *See*, *e.g.*, *Ryan*, 168

10

F.3d at 524; *Palmieri v. United States*, 896 F.3d 579, 590 (D.C. Cir. 2018) (Katsas, J., concurring).  The question is difficult. On the one hand, *Egan* broadly held that the decision to grant security clearances "is committed by law to the appropriate agency of the Executive Branch."  484 U.S. at 527.  And it did so for reasons that seem to "encompass constitutional challenges as well as statutory ones."  *Palmieri*, 896 F.3d at 590 (Katsas, J., concurring); *see Hill v. Dep't of Air Force*, 844 F.2d 1407, 1411 (10th Cir. 1988) ("[I]f the statutory constraints imposed in *Egan* can be bypassed simply by invoking alleged constitutional rights, it makes the authority of *Egan* hardly worth the effort.").  On the other hand, *Egan* involved only a statutory claim under the CSRA.  And soon after *Egan*, the Supreme Court stressed that it would present a "serious constitutional question" to deny a plaintiff any judicial forum in which to raise colorable constitutional challenges to agency action.  *Webster v. Doe*, 486 U.S. 592, 603 (1988) (cleaned up).

On the surface, there is tension between these holdings. But *Webster* concerned only the statutory authority of the Director of Central Intelligence to fire agency employees— which was held not to foreclose judicial review of constitutional claims.  *See* 486 U.S. at 603.  *Webster* did not consider claims that might impinge on the President's core Article II powers as the head of the Executive Branch and as Commander in Chief.  And *Egan* held that the authority to "protect national security information" by denying or revoking security clearances is such a core Article II power.  484 U.S. at 527.  At a minimum, *Egan* makes clear that generally applicable statutes should not be applied to impinge on that power absent some clear statement by Congress.  *See, e.g.*, *Egan*, 484 U.S. at 526–30 (CSRA); *Oryszak v. Sullivan*, 576 F.3d 522, 525–26 (D.C. Cir. 2009) (Administrative Procedure Act); *Ryan*, 168 F.3d at 523–24 (Title VII).  And where Congress has not restricted the President's exercise of that

11

power, we think *Egan* also bars judicial review of constitutional claims like Lee's.  In that circumstance, the reasoning of *Egan* triggers application of the political question doctrine, which forecloses review of constitutional claims.

A

The political question doctrine recognizes that some issues cannot be resolved by federal courts.  The doctrine is "a function of the separation of powers."  *Baker v. Carr*, 369 U.S. 186, 210 (1962).  It rests on the fact that the Constitution leaves "the performance of many duties in our governmental scheme to depend on the fidelity of the executive and legislative action."  *Colegrove v. Green*, 328 U.S. 549, 556 (1946).  Thus, even as Chief Justice Marshall declared that it is "emphatically the province and duty of the judicial department to say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803), he announced what is now the political question doctrine:  "Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court."  *Id.* at 170; *see also id.* at 170–71 ("Where the head of a department acts in a case, in which executive discretion is to be exercised; in which he is the mere organ of executive will; it is again repeated, that any application to a court to control, in any respect, his conduct, would be rejected without hesitation.").

In *Baker*, the Supreme Court distilled the doctrine into its modern form.  It explained that an issue presents a nonjusticiable political question if there is:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy

12

determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. at 217. To find a political question, "we need only conclude that one of these factors is present." *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 841 (D.C. Cir. 2010) (en banc) (cleaned up). But the factors are sometimes related. For example, a "lack of judicially manageable standards may strengthen the conclusion that there is a textually demonstrable commitment to a coordinate branch." *Nixon v. United States*, 506 U.S. 224, 228–29 (1993).

Recent decisions have emphasized the first two factors as the "most important" ones. *Schieber v. United States*, 77 F.4th 806, 810 (D.C. Cir. 2023) (quoting *Harbury v. Hayden*, 522 F.3d 413, 418 (D.C. Cir. 2008)). For example, in *Nixon*, the Supreme Court held that the question of what counts as a constitutionally required trial under the Impeachment Trials Clause, which gives the Senate the "sole power to try all Impeachments," U.S. Const. Art. 1, § 3, cl. 6, is textually committed to the Senate. *See* 506 U.S. at 228–36. And in *Rucho*, the Court held that First and Fifth Amendment challenges to political gerrymanders are nonjusticiable due to a lack of judicially manageable standards. *See* 588 U.S. at 718.

B

The political question doctrine applies perhaps most vigorously to issues bearing on national security. *See Haig v.*

13

*Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention."). This follows from the comprehensive constitutional commitment of "decision-making in the fields of foreign policy and national security … to the political branches." *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005). Article I of the Constitution allocates extensive national-security powers to Congress, which has responsibility to "provide for the common Defence," U.S. Const. Art. I, § 8, cl. 1; to "regulate Commerce with foreign Nations," *id.* cl. 3; to define and punish "Offences against the Law of Nations," *id.* cl. 10; to "declare War" and "make Rules concerning Captures," *id.* cl. 11; to "raise and support Armies," *id.* cl. 12; to "provide and maintain a Navy," *id.* cl. 13; to "make Rules" for those armed forces, *id.* cl. 14; to call forth "the Militia" to "suppress Insurrections and repel Invasions," *id.* cl. 15; and to provide for organizing, arming, disciplining, and governing the militia, *id.* cl. 16. Likewise, Article II allocates extensive national-security powers to the President. Most notably, it vests the President with "the executive Power," U.S. Const. Art. II, § 1 cl. 1, which makes him the "organ of the federal government in the field of international relations." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319–20 (1936). And it makes him the "Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States." U.S. Const. Art. II, § 2, cl. 1. Article II vests these sweeping powers in a single person in part because "[d]ecision, activity, secrecy, and dispatch" are "essential" to the protection of national security. *See* The Federalist No. 70 (A. Hamilton). Yet the Constitution vests no comparable powers in the judiciary.

Given this allocation of authority, the Supreme Court has always been reluctant to second-guess the Executive Branch on

14

matters of national security—especially where Congress has not acted to restrict it. For example, in *Martin v. Mott*, 25 U.S. (12 Wheat) 19 (1827) (Story, J.), the plaintiff argued that the President had unconstitutionally called forth the militia despite the absence of any invasion. *Id.* at 28–29. The Court declined to review that claim. It reasoned that "the authority to decide whether the exigency has arisen belongs exclusively to the President" as the Commander in Chief, so "his decision is conclusive upon all other persons." *Id.* at 30 (cleaned up). Moreover, judicial review would be untenable because evidence supporting the President's decision "might be of a nature not constituting strict technical proof, or the disclosure of the evidence might reveal important secrets of state, which the public interest, and even safety, might imperiously demand to be kept in concealment." *Id.* at 31.

*Orloff v. Willoughby*, 345 U.S. 83 (1953), rested on similar logic. There the Court refused to review the President's decision not to commission an army conscript as an officer so that he could serve as a doctor. *See id.* at 85. The President based his decision on doubts about the doctor's loyalty to the United States, after the doctor had refused to discuss his personal beliefs or to answer whether he had ever been a Communist. *See id.* at 89–90. The Court refused to consider the doctor's statutory and Fifth Amendment challenges to the decision. It reasoned that "the commissioning of officers in the Army is a matter of discretion within the province of the President as Commander in Chief." *Id.* at 90. And it explained courts "have never assumed by any process to control" that kind of decision because "[o]rderly government requires that the judiciary be … scrupulous not to interfere with legitimate [military] matters." *Id.* at 90, 94. The dissenting justices argued that the doctor was entitled to be discharged, but they disclaimed any authority "to compel the grant of a commission." *Id.* at 99 (Frankfurter, J., dissenting).

15

Then, in *Gilligan v. Morgan*, 413 U.S. 1 (1973), the Court held nonjusticiable a due process claim seeking to restrain future behavior of the National Guard. *See id.* at 3–5. The Court reasoned that Congress and the President have exclusive authority "over the training, weaponry and orders of the Guard." *Id.* at 7. Likewise, "professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments" that must be made by political branches "periodically subject to electoral accountability." *Id.* at 10. Indeed, the Court found it "difficult to think of a clearer example of the type of governmental action intended by the Constitution to be left to the political branches." *Id.*

We have followed the Supreme Court's lead, consistently holding "that courts are not a forum for reconsidering the wisdom of discretionary decisions made by the political branches in the realm of foreign policy or national security." *El-Shifa*, 607 F.3d at 842. For example, in *People's Mojahedin Org. of Iran v. Dep't of State*, 182 F.3d 17 (D.C. Cir. 1999) (*PMOI*), we held nonjusticiable a claim that the Secretary of State, in designating two groups as Foreign Terrorist Organizations, had erroneously concluded that their activity "threatens … the national security of the United States." 8 U.S.C. § 1189(a)(1)(C); *see PMOI*, 182 F.3d at 23–24. In *Schneider*, we held nonjusticiable tort claims predicated on covert foreign action that allegedly had caused the death of a Chilean general. *See* 412 F.3d at 191–93. And in *El-Shifa*, we held nonjusticiable tort and international-law claims predicated on the decision to bomb a foreign target suspected of manufacturing chemical weapons for terrorists. *See* 607 F.3d at 844. In all these cases, we reasoned that the Constitution commits national-security judgments to the political branches. *See id.* at 845; *Schneider*, 412 F.3d at 195–96; *PMOI*, 182 F.3d at 23. And we explained that the judiciary cannot review them

16

because it is the job of the Executive—not the courts—"to acquire and exercise the expertise of protecting national security." *Schneider*, 412 F.3d at 196 (quoting *Ctr. for Nat'l Sec. Studs. v. DOJ*, 331 F.3d 918, 932 (D.C. Cir. 2003)). Finally, quoting *Gilligan*, we found it "difficult to conceive of an area of governmental activity in which the courts have less competence." *Id.* at 197 (quoting 413 U.S. at 10); *see El-Shifa*, 607 F.3d at 844 (same); *PMOI*, 182 F.3d at 23 (similar).

These precedents confirm that the issue of national security is a "quintessential source[] of political questions." *Bancoult v. McNamara*, 445 F.3d 427, 433 (D.C. Cir. 2006). Of course, not every case touching on national security lies beyond judicial cognizance. Each question must be considered "in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action." *Baker*, 369 U.S. at 211–12. But these precedents establish that federal courts generally may not second-guess the political branches' discretionary judgments about matters of national security.

C

As *Egan* makes clear, an Executive Branch decision to deny or revoke a security clearance is just such a judgment. For one thing, the Constitution commits that decision to the Executive. And at least absent congressional action to restrict executive discretion in this area, there are no manageable standards to support judicial review of clearance decisions.

1

The Constitution commits the question whether to deny or revoke a security clearance to the Executive Branch. *Egan* said as much. Article II vests "[t]he executive Power" in the

17

President and makes him the "Commander in Chief" of the armed forces. U.S. Const. Art. II, § 1, cl. 1 & § 2, cl. 1. And *Egan* held that these powers carry with them the "authority to classify and control access to information bearing on national security and to determine whether an individual is sufficiently trustworthy to occupy a position in the Executive Branch that will give that person access to such information." 484 U.S. at 527. Likewise, Article II makes the President the "organ of the federal government in the field of international relations," *Curtiss-Wright*, 299 U.S. at 320, which requires him to control access to sensitive information. No less an authority than George Washington explained that the conduct of foreign affairs "must often depend on secrecy." Message to the House of Representatives, Declining to Submit Diplomatic Instructions and Correspondence (Mar. 30, 1796). On his telling, disclosure might have a "pernicious influence on future negotiations; or produce immediate inconveniences, perhaps danger and mischief, in relation to other powers." *Id.*

Other considerations reinforce the textual commitment. Historical practice is important in determining the scope of executive power. *See*, *e.g.*, *NLRB v. Noel Canning*, 573 U.S. 513 (2014). And *Egan* referenced the relevant history: "Since World War I, the Executive Branch has engaged in efforts to protect national-security information by means of a classification system graded according to sensitivity." 484 U.S. at 527; *see also* H. Relya, *The Presidency and the People's Right to Know*, *in* The Presidency and Information Policy 1, 9–29 (H. Relya ed. 1981) (describing protection of national-security information since the Civil War). Moreover, the textual commitment serves urgent functional objectives, for disclosure could help a hostile nation neutralize this Nation's defenses, mitigate our technological advantages, frustrate our intelligence operations, or pose many other problems. *See* Note, *Developments in the Law: The National Security Interest*

18

*and Civil Liberties*, 85 Harv. L. Rev. 1130, 1190–91 (1972), *cited in Egan*, 484 U.S. at 527.

In other cases as well, the Supreme Court has confirmed the President's broad authority to protect national-security information. In *Martin*, the Court found unreviewable the President's assessment of national-security exigencies, in part because the public safety "might imperiously demand" that the relevant information be kept secret. 25 U.S. at 31. In *Totten v. United States*, 92 U.S. (2 Otto) 105 (1875), the Court held nonjusticiable claims arising from alleged espionage relationships with the United States, because litigation "would inevitably lead to the disclosure of matters which the law itself regards as confidential." *Id.* at 107 (barring contract claims); *see Tenet v. Doe*, 544 U.S. 1, 5 (2005) (barring due-process claims). In *United States v. Reynolds*, 345 U.S. 1 (1953), the Court recognized a state secrets privilege to prevent disclosure of national-security information. *Id.* at 10; *see also United States v. Burr*, 25 F. Cas. 30, 37 (CC Va. 1807) (No. 14,692d) (Marshall, C.J.) (recognizing the President's privilege to withhold information "which would endanger the public safety"). In *Snepp v. United States*, 444 U.S. 507 (1980), the Court explained that the President must be able to control classified information because disclosure could compromise intelligence operations and "even endanger the personal safety of foreign agents." *Id.* at 509 n.3 & 512. And in *United States v. Nixon*, 418 U.S. 683 (1974), even as it rejected an expansive assertion of executive privilege, the Court confirmed the President's Article II power to "protect military, diplomatic, or sensitive national security secrets." *Id.* at 706.

These precedents establish that protecting national-security information is an essential component of the Executive Power that Article II vests in the President. The President thus has "broad discretion to determine who may have access to it,"

19

*Egan*, 484 U.S. at 529, which makes clearance decisions "discretionary" executive decisions with significant national-security implications, *id.* at 527. And our precedent makes clear that the judiciary is "not a forum for reconsidering … discretionary decisions made by the political branches in the realm of … national security." *El-Shifa*, 607 F.3d at 842.

We do not suggest that a dispute is nonjusticiable simply because it tangentially relates to a security clearance. In *National Federation of Federal Employees v. Greenberg*, 983 F.2d 286 (D.C. Cir. 1993), this Court held justiciable constitutional challenges to the "methods used to gather information" for clearance decisions. *See id.* at 290. Specifically, we allowed judicial review of (but rejected on the merits) claims that the Fifth Amendment prohibited asking clearance applicants about their use of illegal drugs or their mental health. *See id.* The plaintiffs in *Greenberg*, who were agency employees likely to be asked those questions in future clearance adjudications, sought prospective relief barring use of the questions. *See id.* at 287–88. Their alleged injuries—the compelled disclosure of incriminating or private facts—thus existed regardless of how the government might have resolved any particular application. *See id.* at 291–95. In allowing judicial review of these claims, we stressed that the *Greenberg* plaintiffs did not seek review of "discretionary judgments" regarding the merits of any "particular employee's security clearance." *Id.* at 290. And we assumed, at least *arguendo*, that "the President has unlimited and judicially unreviewable constitutional power to determine which Executive Branch employees will be given access to the nation's secrets." *Id.*

In sum, the Constitution commits "the grant of security clearance to a particular employee"—which is a "sensitive and inherently discretionary judgment call"—to the "appropriate

20

agency of the Executive Branch" subject to the President's direction pursuant to Article II. *Egan*, 484 U.S. at 527. The Supreme Court established these points in *Egan*, and we did not stray from them in *Greenberg*.

2

The second *Baker* factor is a "lack of judicially discoverable and manageable standards" for resolving the question presented. 369 U.S. at 217. This consideration may suffice to make a question nonjusticiable. *See Rucho*, 588 U.S. at 696. Or it may "strengthen the conclusion that there is a textually demonstrable commitment to a coordinate branch." *Nixon*, 506 U.S. at 228–29.

The standards at issue, even if articulable in the abstract, must be manageable as applied to the specific national-security dispute at issue. In other words, if the relevant standards "defy judicial application" in the case, that cuts in favor of nonjusticiability. *See Baker*, 369 U.S. at 211. For example, the plaintiff in *Schneider* argued that tort-law "standards for evaluating wrongful death are well established." 412 F.3d at 196 (cleaned up). We found that statement of "no help." *Id.* Instead, we concluded that tort standards defied judicial application because they required us to determine "whether actions or omissions by an Executive Branch officer in the area of foreign relations and national security were 'wrongful'"—a judgment we held that no court could make. *Id.* at 196–97.

Adjudicating constitutional challenges to clearance decisions often would present such unmanageable questions. Clearance decisions involve an assessment of intangible qualities such as "loyalty to the United States, strength of character, trustworthiness, honesty, reliability, discretion, and sound judgment." Exec. Order No. 12,968, 60 Fed. Reg. at 40250. And they involve "predictive judgment" about whether

21

individuals are likely to divulge sensitive information "under compulsion of circumstances or for other reasons," which is "an inexact science at best." *Egan*, 484 U.S. at 528–29 (cleaned up). According to the Supreme Court, "this must be a judgment call" that is "committed to the broad discretion of the agency responsible," and "it is not reasonably possible for an outside nonexpert body to review the substance of such a judgment." *Id.* at 529. Yet constitutional challenges often require courts to make nuanced judgments about the challenged government action: What was its motivation? That is precisely the question that *Ryan* held off-limits. *See* 168 F.3d at 524. Did the government have a compelling, substantial, or legitimate interest for its decision? Was its reasoning adequately tailored to that interest? In the context of clearance decisions, a court could not answer such questions without doing what *Egan* said is not reasonably possible.

## D

Under these general principles, Lee's constitutional claims are not justiciable.

## 1

We start with Lee's Fifth Amendment claims against DOJ. For due process, Lee asserts that the agency's revocation decision rested on "pretextual and untrue statements" about deception in past polygraph exams and that the revocation harmed his reputation and future job prospects. J.A. 58–59. For equal protection, Lee further asserts that the revocation rested on polygraph exams tainted by race and national-origin discrimination. *Id.* at 42–45. Unlike the claims in *Greenberg*, Lee's claims rest squarely on harms from the revocation decision itself, and they squarely challenge the substantive basis for that decision. Moreover, unlike the plaintiffs in *Greenberg*, Lee does not seek relief against an agency decision

22

discrete from the revocation decision. To the contrary, Lee seeks reinstatement, backpay, and compensatory damages from his termination—a decision that all agree flowed inexorably from the revocation decision. *Id.* at 63. Because Lee's Fifth Amendment claims squarely target the revocation decision itself, they are textually committed to the Executive Branch. *See Egan*, 484 U.S. at 528.

Moreover, there are no judicially manageable standards for resolving either claim. For due process, Lee complains that the government's justification for the revocation was pretextual because the "blips" noted by Smiedala on the 2018 polygraph "were not large enough" to indicate deception. J.A. 52. Likewise, he complains that Santangelo did not investigate further upon concluding that the results of the polygraph were "at best inconclusive and at worst provide[d] some grounds for believing" Lee had been deceptive or used countermeasures. *Id.* at 62. These objections bear on whether Executive Branch officials had good enough reasons to revoke Lee's clearance. But it is not for us to "determine what constitutes an acceptable margin of error in assessing the potential risk" of granting or renewing a clearance. *Egan*, 484 U.S. at 529.

The equal protection claim is also unmanageable. It turns on allegations of impermissible motive—that the agents administering Lee's polygraph examinations discriminated against him based on his Chinese ancestry. But as we explained in *Ryan*, claims that DOJ denied a clearance based on an impermissible motive necessarily involve "reviewing the merits of DOJ's decision," which *Egan* prohibits. *See* 168 F.3d at 524. The plaintiffs in *Ryan* alleged national-origin discrimination when the government denied their clearance applications because they had lived outside the United States for an extended period. *See id.* at 522. We disclaimed the power and the competence to assess whether that should have

23

made any difference in the clearance decisions. *See id.* at 524. Likewise, Lee alleges discrimination from a series of questions focused on his fluency with, and exposure to, various "dialects of Chinese." J.A. 42. We cannot, and should not, second-guess the Executive Branch on whether such considerations are relevant to the determination whether Lee should have access to classified information. *See Egan*, 484 U.S. at 527–30.

2

We next consider the constitutional claims for damages against Smiedala and Santangelo. Lee cannot circumvent the political question doctrine "by bringing claims against the individuals who committed the acts in question within the scope of their employment." *Harbury*, 522 F.3d at 420. His Fifth Amendment claims against these individuals rest on the same conduct as his Fifth Amendment claims against the government itself. As explained above, *Egan* makes them nonjusticiable.

That leaves the First Amendment claim against Smiedala. Lee alleges that Smiedala failed Lee on his 2018 polygraph exam in retaliation for Lee's assertedly protected speech to media outlets, which led to the subsequent clearance revocation. J.A. 60–61. Like the Fifth Amendment claims, this one also rests on injuries arising from the revocation and challenges its substantive basis. So, it too is barred by *Egan*. And in any event, First Amendment retaliation claims cannot support damages actions against federal officials. *See Egbert v. Boule*, 596 U.S. 482 (2022); *Loumiet v. United States*, 948 F.3d 376 (D.C. Cir. 2020).

V

The Constitution commits the protection of national-security information to the political branches, and Congress has

24

attempted neither to restrict, nor to make judicially reviewable, Executive Branch clearance decisions.   Accordingly, Lee's claims here are nonjusticiable under *Egan*.

*Affirmed.*